UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )     1:05-cv-1102-JDT-TAB |
| | ) |
| ALANAR, INC., et al., | ) |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| CHURCHMEN'S INVESTMENT CORP., et al., | ) |
| | ) |
| Defendants. | ) |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW
REGARDING JULY 16, 2007 EVIDENTIARY HEARING**[1]

This matter comes before the court upon the Motion and Memorandum

Concerning Proposed Plan to Pool Assets and Adopt Claims Procedure (Doc. No. 230)

(the "Pooling Motion") filed by Bradley W. Skolnik, court-appointed Receiver (the

"Receiver"), the Motion and Memorandum Concerning Proposed Bondholder

Committee's Plan (Doc. No. 237), as amended (the "Committee Plan"), filed by the

group of Intervenors who refer to themselves as the "Bondholder Committee" (the

"Committee"), and the Unopposed Motion for Court to Consider Receiver's Alternative

---

[1]  This Entry is a matter of public record and will be made available on the court's web site and the web site maintained by the Receiver for posting such things.  However, the discussion contained herein is not sufficiently novel to justify commercial publication.

Plan for Disposition of Assets of Receivership Estate (Doc. No. 295) (the "Alternative Plan") filed by the Receiver.

This is a very difficult case in terms of the devastating impact on the lives of the many well-intentioned people who made good faith investments in the Reeves' entities. Many investors placed their life savings into these investments. Now the investors face the potential that there is little hope they will achieve the expected, or perhaps any, return on their investments, or that the churches they intended to help will realize any benefit. And all of this is because of improper manipulations, inappropriate transfers, convoluted and inadequate record-keeping and defalcations by a few – the promoters of these Reeves entities. It does not even appear that the investors or the bond issuers could have known of the perfidies of Reeves entity schemers. There is neither an easy nor a perfect solution to the problems these schemers have created. However, the court endeavors to ameliorate the harms these schemers have caused the innocent persons and entities who were unknowingly caught up in these events.

The court hereby notices the procedural history pertinent to these motions, and enters its Findings of Fact and Conclusions of Law as follows:

## I.  PROCEDURAL HISTORY

1.  On July 26, 2005, Plaintiff, the United States Securities and Exchange Commission (the "Commission") filed its Complaint against numerous entities and Defendants, including Vaughn A. Reeves, Sr., Vaughn A. Reeves, Jr., Jonathan Christopher Reeves and Joshua Craig Reeves (collectively the "Reeves"), alleging that

2

the Reeves, through the companies they created and controlled, including Defendant, Alanar, Inc. ("Alanar"), raised at least $120,000,000 through Bond Issues and $50,000,000 through the sale of Bond Fund units; that the Reeves violated federal securities laws by misusing the proceeds of the Bond Issues and the Bond Fund unit sales, by misapplying repayments from the churches issuing such bonds (the "Issuers"), and by making false and misleading statements to the purchasers and potential purchasers of the bonds or Bond Fund units.  (Joint Stipulation, Stipulation of Facts, ¶ 1.)

2.  Also on July 26, 2005, the court entered an Order of Permanent Injunction and Other Relief (Doc. No. 8), in which it appointed Mr. Skolnik as an Independent Monitor with a mandate to protect the interests of Bondholders and Bond Fund investors (the "Investors").  As Monitor, Mr. Skolnik was given final approval authority over the day-to-day operations of Alanar, Defendants, Guardian Services, LLC ("Guardian"), First Financial Services of Sullivan County, Inc. ("First Financial") and the Liberty Group, Inc. ("Liberty") (collectively the "Paying Agents"), the Bond Funds named as Defendants in this action, the non-defendant Bond Funds, and certain entities named as Relief Defendants in the Commission's Complaint (collectively the "Relief Defendants").  (Joint Stipulation, Stipulation of Facts, ¶ 2.)

3.  On December 20, 2005, the court entered its Order Granting Plaintiff Securities and Exchange Commission's Motion to Convert Monitorship to Receivership (Doc. No. 73) (the "Receivership Order"), appointing Mr. Skolnik receiver for Alanar, the Defendant Bond Funds, the non-defendant Bond Funds, the Paying Agents, and the

Relief Defendants (collectively, the "Receivership Defendants").  (Joint Stipulation, Stipulation of Facts, ¶ 3.)

4.  On June 27, 2006, the court filed its Entry Granting Motions to Intervene (Doc. No. 155), permitting the Committee to intervene in this action for the purposes of: (1) appearing and obtaining copies of pleadings and (2) filing motions and responses to pleadings that other parties may file when issues arise that affect them.  (Entry Granting Mots. Intervene 13.)

5.  The Receiver filed the Pooling Motion (Doc. No. 230) on April 13, 2007.

6.  Also on April 13, 2007, the Receiver filed a Motion and Memorandum for Hearing on the Proposed Plan to Pool Assets and Proposed Claim Procedure (Doc. No. 231), requesting that the Pooling Motion be set for hearing and that procedures be established to provide interested parties with notice of the hearing and an opportunity to object or comment on the Pooling Motion.

7.  A status conference was held on April 17, 2007, and the court set an evidentiary hearing for July 16, 2007 on the Pooling Motion and any other plans for distribution of assets of the Receivership Estate (Doc. No. 232).

8.  The Committee filed the Committee Plan on April 24, 2007.

9.  On May 11, 2007, the Committee filed a Motion to amend the Committee Plan (Doc. No. 253).

10.  On May 14, 2007, the court entered its Order Approving Notice (Doc. No. 256), approving the form of the notice informing interested persons of the July 16, 2007 evidentiary hearing and their opportunity to object or comment on proposed plans for distribution of the assets of the Receivership Estate (the "Hearing Notice").

11.  Also on May 14, 2007, the court granted the Committee's motion to amend the Committee Plan (Doc. No. 258), and the Committee filed the Amended Committee Plan that same date (Doc. No. 255).

12.  On May 21, 2007, the Receiver filed his Motion for Authorization to Issue Notices in Compliance with Order Approving Notice (Doc. No. 262) (the "Motion to Issue Notices"), requesting permission to mail the Hearing Notice, the Pooling Motion, and the amended Committee Plan to all Investors and Issuers (Mot. Issue Notices 1-4).

13.  On May 22, 2007, the court granted the Motion to Issue Notices (Doc. No. 264).

14.  On July 9, 2007, the Receiver and the Committee filed a Joint Stipulation of Facts and Documents (Doc. No. 294) (the "Joint Stipulation").

15.  Also on July 9, 2007, the Receiver filed the Alternative Plan with the approval of the Committee.

16.  On July 10, 2007, the court ordered that the Alternative Plan be considered at the July 16, 2007 evidentiary hearing, and further ordered that the Receiver post copies of the Alternative Plan, the court's Order authorizing consideration of the

5

Alternative Plan, and a notice that the Alternative Plan would be considered at the July 16, 2007 evidentiary hearing on the Receiver's web site (Doc. No. 296).

17.  The evidentiary hearing was held on July 16, 2007, at which time the court heard arguments and evidence on the Pooling Motion, the Committee Plan, and the Alternative Plan.

18.  At the July 16, 2007 evidentiary hearing, the court accepted into evidence all stipulated documents and facts contained in the Joint Stipulation, as well as Exhibits 20, 21 and BC-2, which were introduced at the hearing.  (Evid. Hr'g Tr. ("Hr'g Tr."), 38, July 16, 2007.)

19.  Additionally, the Alternative Plan was amended at the July 16, 2007 evidentiary hearing to add a new paragraph 7 to Article III of the Alternative Plan (per Exhibit 22, introduced into evidence at the hearing) and to delete the words "not rehabilitated" from paragraph 2 of Article X of the Alternative Plan.  (Hr'g Tr. 15-18). The amendments were accepted by the court.  (*Id.* at 18.)

20.  Following the July 16, 2007 evidentiary hearing, the court ordered by minute entry that the Receiver was to post notice on the Receiver's web site of an additional period of twenty-one (21) days for interested parties to object or comment on the proposed plans presented at the evidentiary hearing, including the Alternative Plan (Doc. No. 297).  The court also ordered the Receiver to submit Findings of Fact and Conclusions of Law for the Alternative Plan within thirty (30) days of the evidentiary hearing (*Id.*).

6

21.  Pursuant to the court's minute entry, the Receiver submitted a proposed Notice Regarding Additional Opportunity of Interested Parties to Comment on Proposed Plans, Including the Receiver's Alternative Plan for Disposition of Assets of the Receivership Estate (Doc. No. 298) (the "Additional Comment Notice") on July 17, 2007.

22.  The court approved the Additional Comment Notice that same day (Doc. No. 299).

23.  The court, having examined the Pooling Motion, the Committee Plan, as amended, the Alternative Plan, the Joint Stipulation and the evidence presented at the July 16, 2007 evidentiary hearing, having reviewed the comments and objections sent pursuant to the Hearing Notice and the Additional Comment Notice, and having heard the arguments of counsel at the evidentiary hearing, now enters its Findings of Fact and Conclusions of Law.

## II.  FINDINGS OF FACT

1.  The Hearing Notice advised interested persons of the date, time, and place of the evidentiary hearing and their right to attend.  (Hr'g Notice 1.)  In addition, the Hearing Notice informed interested parties of their right to object and comment on proposed distribution plans and provided mailing and email addresses to submit objections and comments to the court, the Receiver, and the Committee.  (*Id.* at 1-2.)

2.  Eight Thousand One Hundred Ninety-Five (8,195) Hearing Notices, including copies of the Pooling Motion and the amended Committee Plan, were mailed to

Investors and Issuers, approximately 400 of which were returned as undeliverable. (Hr'g Tr. 87-88.)  Approximately 170 Hearing Notices were returned with forwarding information, which were re-mailed.  (*Id.*)  Copies of the Hearing Notice, Pooling Motion, and amended Committee Plan were also posted on the Receiver's web site.  (*Id.* at 88-89.)

3.  On July 6, 2007, the parties informed the court they had reached an agreement with respect to the submission of the Alternative Plan, which was approved by the Committee.

4.  Immediately after the court ordered that the Alternative Plan would be considered at the July 16, 2007 evidentiary hearing, the Receiver posted copies of the Alternative Plan, the court's Order authorizing consideration of the Alternative Plan, and a notice that the Alternative Plan would be considered at the July 16, 2007 evidentiary hearing on the Receiver's web site.  (Hr'g Tr. 90.)

5.  Immediately after the Additional Comment Notice was approved by the court, it was posted on the Receiver's web site.  The court's record was left open until August 7, 2007, for additional comments by letter or email from interested persons.

6.  The court received numerous letters and emails commenting on the proposed plans.  The vast majority of these were received prior to the July 16, 2007 evidentiary hearing; a few were received after that hearing.  Most of the comments received subsequent to the hearing have been supportive of the Alternative Plan.  The court has

8

reviewed the objections and comments sent in response to the Hearing Notice and the Additional Comment Notice.

7.  The bonds were issued subject to a prospectus that was prepared by Alanar as well as a Trust Indenture and a Bond Service Agent Agreement between the Issuer (the entity borrowing the money), an Indenture Trustee, and one of the Paying Agents. Pursuant to the Trust Indenture, the Paying Agent acts as a pass-through entity.  In that role, the Paying Agent is required to place the proceeds from the sale of bonds to the Investors in a "Bond Proceeds Account" for disbursement to the Issuers.  (Trust Indenture, Section 501.)  Likewise, the Paying Agent is required to place funds received from Issuers for repayment of principal and interest into a "Bond Repayment Account" for payment to bondholders.  (Trust Indenture, Section 406.)  Alanar generally used the same form Trust Indenture for all its bond offerings.  The Trust Indenture also provided for an Indenture Trustee.  Southern Michigan Bank and Trust acted as Trustee for at least forty-nine (49) of the currently outstanding Bond Issues, Paying Agents acted as Trustee for approximately one hundred twenty (120) of the relevant Bond Issues previously outstanding, and various other individuals and entities acted as Trustee on the remaining Bond Issues.  The Trust Indenture gave the Paying Agents access to the funds in the Bond Proceeds and Bond Repayment Accounts.  A representative copy of a Bond Prospectus is attached as Exhibit B to the Pooling Motion, a representative copy of a Trust Indenture is attached as Exhibit C to the Pooling Motion, and a representative copy of a Bond Service Agent Agreement is attached as Exhibit D to the Pooling Motion.  (Joint Stipulation, Stipulation of Facts, ¶ 4.)

9

8.  Since 2001 Alanar has also conducted offerings in forty-two (42) Bond Funds, twenty-four (24) of which are Defendants in this action and eighteen (18) of which are not named as Defendants.  Alanar marketed these investments by issuing Private Placement Memorandums ("PPMs") to Investors and advised Investors that the fund-raising offer was exempt from registration with the Commission and state securities regulators.  The Bond Funds were presented as four distinct types of funds: aggressive growth, aggressive income, growth, and income.  The investment objectives for the Aggressive Growth Bond Funds and the Growth Bond Funds were identical: "Our primary investment objective is to provide growth in capital and preserve your principal." (PPM for Aggressive Growth Bond Funds, Investment Objectives and Principal Strategies 1; PPM for Growth Bond Funds, Investment Objectives and Principal Strategies 1.)  The investment objectives of the Aggressive Income Bond Funds and the Income Bond Funds were also identical: "Our primary investment objective is to provide a high level of current income and preserve your principal."  (PPM for Aggressive Income Bond Funds, Investment Objectives and Principal Strategies 3; PPM for Income Bond Funds, Investment Objectives and Principal Strategies 3.)  Each of these Bond Funds was supposed to invest in church bonds sold by Alanar and also in other secure forms of debt instruments such as investment grade Corporate Debt Securities and United States Government Obligations.  (PPM for Aggressive Income Bond Funds, How the Fund Invests 4; PPM for Income Bond Funds, How the Fund Invests 4; PPM for Aggressive Growth Bond Funds, How the Fund Invests 3; PPM for Growth Bond Funds, How the Fund Invests 3.)  In addition, prior to investing in church bonds, Alanar, as Bond Fund "issuer," undertook to conduct an "independent credit analysis" of the

10

bond-issuing church prior to making an investment in the church's bonds.  Through these Bond Fund offerings, Alanar raised an additional $50,000,000 from Investors.  A representative copy of a PPM for an Aggressive Growth Bond Fund is attached as Exhibit E to the Pooling Motion, for an Aggressive Income Bond Fund is attached as Exhibit F to the Pooling Motion, for a Growth Bond Fund is attached as Exhibit G to the Pooling Motion, and for an Income Bond Fund is attached as Exhibit H to the Pooling Motion.  (Joint Stipulation, Stipulation of Facts, ¶ 5.)

    9.  The Trust Indentures provide that "[m]oneys in the Bond Repayment Fund shall be expended solely for the payment of the principal of, premium if any, and interest on the Bonds . . . ," subject to limited exceptions not applicable to the withdrawals made in this case (e.g., income on the moneys held in the Bond Repayment Fund was to be paid to the Paying Agent for its services) (Trust Indenture, Section 408; Bond Service Agent Agreement, Section 402.)  As a result, the withdrawals from the Bond Repayment Funds for other, non-authorized purposes were in violation of the Trust Indentures and the Bond Service Agent Agreements.  (Joint Stipulation, Stipulation of Facts, ¶ 10.)

    10.  The Reeves used three entities which they controlled as the conduits for these transfers: Relief Defendants, Churchmen's Capital Group, Inc. ("CCG"), Churchmen's Investment Corporation ("CIC"), and Liberty (which was also a Paying Agent).  The Reeves would cause money to be removed from one of the Bond Repayment Accounts for one Bond Issue and transferred to CCG, CIC, or Liberty where it was redeployed to Bond Repayment Accounts for other Bond Issues to allow interest payments or principal repayments to be made on that bond.  The Reeves would also

cause Bond Fund Investor proceeds to be loaned from one Bond Fund to another to supposedly meet cash needs, would cause Bond Fund Investor proceeds to be transferred to the Relief Defendants, and would cause undocumented loans to be made from Bond Fund Investors proceeds to the Relief Defendants and Issuers.  (Joint Stipulation, Stipulation of Facts, ¶ 11.)

11.   The Reeves also caused proceeds from the sale of bonds to Investors to be transferred from an Issuer's Bond Proceeds Account to related entities or other Issuers, and in some instances none of the proceeds from the sale of bonds were actually received by the Issuer whose bonds were sold as a result of these transfers.  (Joint Stipulation, Stipulation of Documents, 4-8; Hr'g Tr. 40, 41, 43.)

12.   In other instances, when an Issuer would send a payoff to completely satisfy its obligations under a Bond Issue, the Reeves would cause funds to be transferred out of the Bond Repayment Account, leaving insufficient funds to repay the Investors of that Bond Issue.  (Joint Stipulation, Stipulation of Documents, 9-11; Hr'g Tr. 48, 49-52.)

13.   From late 2004 until the Commission filed this action, CIC received approximately $4,500,000 directly from four different Bond Repayment Fund Accounts and approximately $900,000 directly from four different Bond Proceeds Accounts.  In addition, during this period CIC also received $974,000 from related entities (Alanar, Guardian and CCG) and $2,700,000 from other churches.  These funds were funneled through an E*Trade account opened by the Reeves in the name of CIC, and much of the money was used to prevent Bond Issues from going into default.  On the back end,

money flowed out of the E*Trade account as follows: $2,700,000 directly to 10 different Bond Repayment Accounts, $1,700,000 to related entities (Alanar, Guardian, and CCG) and $1,200,000 to other churches.  (Joint Stipulation, Stipulation of Facts, ¶ 12, Stipulation of Documents, 15 at 2.)

14.  Alanar recorded this flow of money between accounts as receivables or payables on the books and records of each of the various Bond Issues.  If a Bond Issue has a payable, the Reeves caused another Bond Issue to transfer money to it or used Bond Fund Investor proceeds to transfer the funds.  If a Bond Issue has a receivable, the Reeves caused it to lend money to another Bond Issue.  Out of the 340 outstanding Bond Issues, 308 currently have a receivable, a payable, or both recorded in their records.  Total receivables are $23,612,000 and total payables are $19,105,000.  (Joint Stipulation, Stipulation of Facts, ¶ 13.)  The funds transferred were used to make payments to Investors or others and, as a result, are not available to repay the receivables.  (Hr'g Tr. 35, 37.)

15.  These transfers of funds were accomplished through at least 7,000 individual transactions.  (*Id.* at 34.)  Even if all these transactions were traced individually, the funds transferred have already been utilized and are no longer available.  (*Id.* at 76.)

16.  As an example of this activity, on February 19, 2004, CCG took $1,282,500 out of the Bond Repayment Accounts of thirty-six (36) different Bond Issues, and on February 20, 2004, CCG put $1,286,127.32 into 41 Bond Repayment Accounts for different Bond Issues.  A breakdown of these representative transactions is attached as

13

Exhibit K to the Pooling Motion. (Joint Stipulation, Stipulation of Facts, ¶ 14.) Additional examples of transfers to and from an individual Issuer's Bond Proceeds Accounts and Bond Repayment Accounts were provided at the July 16, 2007 evidentiary hearing. (Hr'g Tr. 39-52; Joint Stipulation, Stipulation of Documents, 4-11.)

17. When money was advanced to a Bond Issue, an "Advance Request Form" was completed to document the transfer. For example, on December 15, 2003, the "145 New City Gospel Repayment Account" requested a $21,200 "advance" from CCG "to cover principal called." On December 3, 2003, the "2027 Churchmen Capital Repayment Account" requested a $10,892.00 "advance" from CCG "to cover a shortfall in issue." Representative copies of these Advance Request Forms are attached as Exhibit L to the Pooling Motion. (Joint Stipulation, Stipulation of Facts, ¶ 15.)

18. It appears that $13,000,000 was lost in bond issues that the Reeves issued through Alanar that were not church related (the "Reeves Losses"), and at least $5,000,000 was paid into Alanar by Investors but never provided to the Issuers. (Joint Stipulation, Stipulation of Facts, ¶ 16, Stipulation of Documents, 1.)

19. The forensic accountant employed by the Receiver, who is qualified as a certified fraud examiner, testified that these activities are typical of a Ponzi scheme and that a high degree of improper commingling of funds occurred. (Hr'g Tr. 70, 71, 73-75.) The Receiver, a former Indiana Securities Commissioner and President of the North American Securities Administrators Association, also testified that a Ponzi scheme occurred and that the funds were used primarily to hide Issuer defaults. (*Id.* at 83-86.)

14

20.  Alanar Rehab, Inc. ("Alanar Rehab"), a recently formed Indiana non-profit corporation, has a qualified management team of officers and directors and a staff of experienced individuals serving as Church Analysts (Facilitators) to perform Alanar Rehab's responsibilities described in the Alternative Plan.  (Hr'g Tr. 172-79.)

21.  Terre Haute Savings Bank ("THSB") is willing to become Successor Trustee as described in the Alternative Plan, provided new documentation can be prepared that is satisfactory to THSB, the Receiver, and counsel for Alanar Rehab.  (*Id.* at 160-62.)

22.  First Security Bank of Batesville, MS ("FSB") is willing to become Successor Paying Agent, Bond Registrar/Transfer Agent, and Depository Bank (Bond Transfer/Paying Agent) as described in the Alternative Plan, provided new documentation can be prepared that is satisfactory to FSB, the Receiver, and counsel for Alanar Rehab.  (*Id.* at 163-65.)

## II.  CONCLUSIONS OF LAW

1.  The offering documents used to sell the Bond Issues and Bond Funds contained misrepresentations and omissions of material facts necessary for Investors to make informed investment decisions.

2.  Among the misrepresentations and omissions was the fact that the proceeds of Bond Issues and Bond Funds, and funds in the Bond Repayment Fund accounts, would be inappropriately manipulated and commingled.  "An omitted fact is material if there is a substantial likelihood that a reasonable [investor] would consider it important

in deciding [whether or not to invest]."  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 439 (1976).  There is no question that disclosure of these practices would have led most Investors to reconsider investing in either the Bond Issues or the Bond Funds.

3.  The inappropriate manipulation and commingling included using funds of one Bond Issue, or a Bond Fund, to make payments of principal and/or interest to Investors of another Bond Issue that would otherwise have been in default.

4.  This pattern of failure to disclose the inappropriate manipulation and commingling had all the essential elements of a Ponzi scheme.

5.  The essence of a Ponzi scheme is that money to which an investor is legally entitled is paid to another investor, often for the explicit purpose of perpetuating the fraud scheme.  This is what happened here, although it was not a typical Ponzi scheme. As the United States Court of Appeals for the Seventh Circuit noted in *Knauer v. Jonathon Roberts Financial Group, Inc.*, 348 F.3d 230 (7th Cir. 2003), a typical Ponzi scheme consists of two phases:

> First, the schemer solicits and receives money for investment, guaranteeing high returns while doing little with the money to produce actual profits.  While in this first stage, the schemer may generate some income for himself by charging a fee or paying himself a salary with the funds, this "sales" step is not the source of most of his Ponzi gains.  After all, the Ponzi schemer is not content to enrich himself modestly by extracting fees or salaries from the funds he has solicited.  Rather, the schemer realizes most of his gains by appropriating large sums of money from the solicited funds, the pace of the withdrawals accelerating as he is ready to disband the Ponzi entity and make off with its assets.  This "embezzlement" step of the Ponzi scheme depletes the Ponzi entity of resources, which are diverted to the entity's principal, the schemer.

*Id.* at 233.

6.  One of the hallmarks of a Ponzi scheme is that it depends on payments to earlier investors to entice later investors to invest.  *United States v. Masten*, 170 F.3d 790, 797 (7th Cir. 1999) ("It is a hallmark of a Ponzi scheme to convince potential investors that capital supplied by investments is in fact profit."); *In re M & L Bus. Mach. Co.*, 84 F.3d 1330, 1332 n.1 (10th Cir. 1996) (defining a Ponzi scheme as "an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments.  Typically, [the scheme's victims] are promised large returns for their investments. Initial investors are actually paid the promised returns, which attract additional investors.").

7.  Here, the Reeves' money-making enterprise depended on their ability to underwrite large numbers of bond offerings and, therefore, benefit from the associated underwriting fees.  The Reeves underwrote large numbers of bond offerings and then shuffled money between accounts to hide the defaults which otherwise would have occurred.  This scheme, and the apparent success of earlier Bond Issues, allowed the Reeves to continue to raise more and more money from unsuspecting Investors.  Because the Investors believed they were helping churches, they did not demand the high rates of return typically found in a Ponzi scheme, which allowed the scheme to perpetuate itself far longer than a typical Ponzi scheme.

8.  In an equity receivership such as this, the court has the power to fashion any distribution plan that is fair and equitable.  *SEC v. Wang*, 944 F.2d 80, 84-85 (2d Cir. 1991); *see also SEC v. Basic Energy & Affiliated Res., Inc.*, 273 F.3d 657, 670-71 (6th Cir. 2001) ("Similarly, in the present case the district court carefully considered the Escrow Investors' arguments, the position of the other BEAR investors, and the facts of the case, and accordingly fashioned a distribution plan that was fair and equitable. Thus, we cannot conclude that the district court has abused its discretion."); *SEC v. Forex Asset Mgmt. LLC*, 242 F.3d 325, 331 (5th Cir. 2001) ("[i]n shaping equity decrees the trial court is vested with broad discretionary power . . . .") (quotation omitted); *SEC v. Elliott*, 953 F.2d 1560, 1566 (11th Cir. 1992) ("The district court has broad powers and wide discretion to determine relief in an equity receivership."); *SEC v. Hardy*, 803 F.2d 1034, 1037 (9th Cir. 1986) ("It is a recognized principle of law that the district court has broad powers and wide discretion to determine the appropriate relief in an equity receivership.") (quotation omitted).

9.  In *United States v. Durham*, 86 F.3d 70 (5th Cir. 1996), the defendants defrauded thirteen (13) consumers of $806,750 through an advance fee loan business whereby consumers were told their investment would be used to originate loans. *Id.* at 71.  When the defendants were finally arrested, only $83,495.52 of assets remained in a single bank account.  *Id.* at 71-72.  All but $8,803.99 in the account could be traced to seven claimants, four of which filed claims.  *Id.* at 72.  Over the objection of the four claimants, "the district court elected in the interest of equity, to distribute the $83,000 pro rata rather than giving the bulk of it to [the claimants] whose funds had been traced."

18

*Id.* In upholding that decision, the United States Court of Appeals for the Fifth Circuit quoted the district court:

> In determining a plan for distribution, the Court must act to determine the most equitable result. In the instant action, all claimants stand equal in terms of being victimized by the defendant defrauders. The ability to trace the seized funds to Claremont and Northernaire is the result of the merely fortuitous fact that the defrauders spent the money of the other victims first. Allowing Claremont and Northernaire to recover from the funds seized to the exclusion of the other victims under the tracing principle would be to elevate the position of those two victims on the basis of the actions of the defrauders. The Court sees no justification in equity for this result.

*Id.* (footnote omitted); *see also Forex Asset Mgmt.*, 242 F.3d at 331.

10.  Due to the extensive commingling of funds, if all Bond Issues are administered separately, a significant number of Investors who have invested in now defaulted Bond Issues as a result of the commingling and transfers would receive no return on their investment, while others who were lucky enough to have invested in Issues where the bonds have not defaulted may receive all of their invested capital plus interest.  As the court in *Durham* noted, this would be inequitable as it "would be to elevate the position of [certain] victims on the basis of the actions of the defrauders." *Durham*, 86 F.3d at 72.  Moreover, as the United States Court of Appeals for the Seventh Circuit explained in *Scholes v. Lehmann*:

> It is no answer that some or for that matter all of Phillips's profit may have come from "legitimate" trades made by the corporations. They were not legitimate. The money used for the trades came from investors gulled by fraudulent representations. Phillips was one of those investors, and it may seem "only fair" that he should be entitled to the profits on trades made with his money. That would be true as between him and Douglas or Douglas's corporations. It is not true as between him and either the creditors of or the other investors in the corporations. He should not be

19

permitted to benefit from a fraud at their expense merely because he was not himself to blame for the fraud.

56 F.3d 750, 757 (7th Cir. 1995).

11.   Additionally, due to the large number of transactions used to commingle the funds, tracing all funds transferred would be extremely difficult and time consuming. Moreover, even if such tracing were performed, most if not all of the funds transferred have already been paid out and are no longer available.

12.   The Hearing Notice sufficiently complied with the statutory requirements of Section 3 of the Securities Act of 1933, as amended, 15 U.S.C. § 77c(a)(10).  In fact, hundreds of interested persons (mostly investors) appeared at the July 16, 2007 evidentiary hearing.  The courtroom was packed to "standing room only" capacity and closed circuit television feeds were provided to other rooms in the courthouse which were also filled with similarly interested spectators.

13.   The court has been adequately advised of the terms and conditions of the three plans and has reviewed each of them, along with all the exhibits submitted by the parties, the evidence submitted at the July 16, 2007 evidentiary hearing, and comments from interested parties made both before and after the evidentiary hearing.

14.   The court carefully has considered all of the plans and finds that the Alternative Plan is superior to the other two proposed plans.

15.   However, the court finds well-taken some of the comments and concerns expressed in a letter, dated August 3, 2007, to the Clerk of the Court from Kenneth C.

20

Mennemeier, attorney for Granite Springs Church in Lincoln, California, which issued bonds sold by Alanar.  First, counsel observes that Article III(1) of the Alternative Plan refers to an "Amended Bond Service Agent Agreement" as Exhibit A and a "Supplemental Trust Indenture" as Exhibit B, but no such exhibits are attached to the Alternative Plan.  Counsel adds that Article III(2) and (3) seem to indicate that the Amended Bond Service Agent Agreement and Supplemental Trust Indenture have not yet been finalized.  The Alternative Plan will be modified so as to delete these references to "(Exhibit A)" and "(Exhibit B)" in Article III(1).  Counsel states that the Granite Springs Church has concerns about a plan that proposes to commit it to forms of agreement that have not yet been prepared and are unavailable for review.  This concern is understandable.  However, the Alternative Plan provides that the Amended Bond Service Agent Agreement and Supplemental Trust Indenture "shall not diminish the rights of the bondholders or bond issuers, other than as provided for under this Plan and order of the Court."  (Alternative Plan, ¶¶ III(2), (3).)  And the Granite Springs Church may choose not to elect Category A status.

16.  The Granite Springs Church also objects to the breadth of the language in the indemnification provision in Article III(4) of the Alternative Plan.  It argues that it would be unreasonable to obligate the Issuers to defend and indemnify the Receiver as to third party claims against the Receiver and/or his agents.  The Receiver responds that the indemnification language is deliberately broad and he relies on the legal principle that "where one of two innocent parties must suffer a loss. . . the loss must be borne by the party whose act or omission made the loss possible."  *Sterling Capital Fin.*

*Servs., Inc.*, 480 N.E.2d 605, 606 (Ind. Ct. App. 1985).  This principle has no applicability here.  While the Issuers authorized the Reeves or Reeves entities to administer the bonds and executed documents that named the Reeves' agents as trustees and/or paying agents, the Issuers did act or fail to act in any way which under even a loose construction could be viewed as making the loss possible.  The Issuers had no hint of the Reeves' scheme.  Thus, the broad indemnification provision would be unreasonable and unfairly shift risks to the Issuers.  The Granite Springs Church has no objection to an order that the Receiver and his agents not be held responsible for any acts or omissions prior to their assuming responsibilities under the Alternative Plan, as contemplated in Article IV(3) of the Plan, provided that there is language further limiting the "acts and omissions" which are included in the provision.  As the Granite Springs Church points out, as written, the language could be construed to cover "acts or omissions" wholly unrelated to Alanar and/or any of the Issuers' bonds.

17.  Having considered these comments, objections and concerns, and having allowed amendments to the Alternative Plan at the July 16 evidentiary hearing, the court finds that the Alternative Plan should be modified and approved.  The modifications are as follows:

a.  The references to "(Exhibit A)" and "(Exhibit B)" in Article III(1) are deleted.

b.  Article III(2) is modified by adding "the Amended" immediately preceding "Bond Service Agent Agreement" in the second sentence.

22

c.  Article III(4) is modified by deleting "indemnify, defend," and by adding "in connection with the bonds" immediately following "all acts or omissions."

d.  Similarly, Article IV(3) is modified by adding "in connection with the bonds" immediately following "any acts or omissions."

e.  To Article III is added a paragraph 7 which reads as follows[2]:

7.  (a)  Southern Michigan Bank & Trust ("SMBT") is a former indenture trustee with respect to forty nine (49) bond offerings.  Nothing in this Approved Plan or any court order approving this Approved Plan (or any action taken or agreement or document executed pursuant to this Approved Plan) shall impair the rights, benefits and protections afforded to SMBT in the "Order Removing Indenture Trustee" entered by the court on November 17, 2006, which rights, benefits and protections shall remain in full force and effect.

(b)  Effective as of the Determination Date, any and all existing and future obligations and duties of SMBT arising from or related to (i) the agreement dated December 27, 2000 between Guardian Services, LLC and SMBT, or (ii) any individual retirement account established or administered by Guardian Services, LLC or its affiliates, shall be terminated and released.  This termination and release of SMBT's obligations is prospective only and does not release SMBT for actions taken prior to the Determination Date.

f.  The words "not rehabilitated" are deleted from Article X, paragraph 2.

g.  The Preamble of the Alternative Plan will be modified appropriately.

h.  Certain typographical errors have been corrected upon the suggestion of counsel for the Bondholder Committee.

---

[2]  The court has modified Exhibit 22 by substituting "Approved Plan" for "Alternative Plan" in this paragraph.

23

i.  The Alternative Plan, as so modified herein, shall be referred to as the "Approved Alternative Alanar Receivership Plan," or, for shorthand reference, the "Approved Plan," the "Alternative Plan" or the "Alanar Plan."

j.  As modified by these conclusions, the Approved Alternative Alanar Receivership Plan is hereby **APPROVED** by the court.  The final approved form of this plan containing all of the modifications will be issued and docketed along with this entry. The Receiver is **ORDERED** to post both on his web site.

18.  The Approved Plan best balances the difficulties resulting from the commingling of funds and the harm caused to Investors with the interests of Issuers who wish to satisfy their obligations to their Investors.  The terms and conditions of the Approved Plan are fair and in the best interest of all interested persons.

19.  The court authorizes and directs the Receiver to take all actions necessary and appropriate to put the Approved Plan into effect.  The Receiver is expressly authorized to negotiate with prospective Trustees and Paying Agents, whether currently introduced to the court or others, regarding agreements for the performance of their respective duties and the forms of Supplemental Bond Indentures and new Bond Service Agent Agreements.

20.  The Receiver has assembled the necessary professionals to assist him in carrying out his responsibilities under the Approved Plan.

21.  The Receiver shall have the ultimate authority in implementing the Approved Plan and directing Alanar Rehab, subject to the terms of the Approved Plan and supervision of this court.

22.  Alanar Rehab shall have the authority to meet with representatives of the Issuers and advise them of their options under the Approved Plan, including rehabilitation and refinancing.  Any proposed rehabilitation or refinancing, however, shall be subject to the approval of the Receiver and this court.

23.  The Receiver is allowed, with the approval of the court, to select alternative banks to serve as Successor Trustee, Successor Paying Agent, Bond Registrar/ Transfer Agent, or Depository Bank (Bond Transfer/Paying Agent) if a satisfactory agreement cannot be reached with THSB or FSB.

24.  The court retains full jurisdiction over all activities of the Receiver and all persons and entities involved in efforts described in this proceeding as refinancing or rehabilitation.

25.  The assigned Magistrate Judge in this case, the Honorable Tim A. Baker, shall have full authority to rule on all matters and approve or disapprove such things as are permitted to be done by 28 U.S.C. § 636(a), (b), (e) and (g) and by Local Rule 72.1 of the Local Rules of this court, and to make reports and recommendations on all other matters.

26.  Where appropriate or necessary, each of the foregoing Findings of Fact shall be considered a Conclusion of Law, and each of the foregoing Conclusions of Law shall be considered a Finding of Fact, or if a mixture of both fact and law, they shall be considered accordingly.

ALL OF WHICH IS ENTERED this 28th day of August 2007.

John Daniel Tinder, Judge
United States District Court

Copies:

John J. Sikora, Jr.
U.S. Securities & Exch. Comm'n
sikoraj@sec.gov

Michael J. Rusnak
David I. Rubin
Harrison & Moberly, LLP
mrusnak@h-mlaw.com
drubin@h-mlaw.com

Bradley W. Skolnik
Stewart & Irwin, P.C.
bskolnik@silegal.com

H. James Maxwell
hjmesq@kc.rr.com

Gordon Toering
Warner, Norcross & Judd LLP
gtoering@wnj.com

Joshua D. Hague
Mark J.R. Merkle
Krieg DeVault
jdh@kdlegal.com
mmerkle@kdlegal.com

Nicholas Anthony Miller
Indiana State Attorney General
nmiller@atg.state.in.us

Vaughn A. Reeves, Sr.
vre1034239@aol.com

Vaughn A. Reeves, Jr.
ctreeves@joink.com

Jonathan Christopher Reeves
jc3reeves@yahoo.com

Joshua C. Reeves
joshua_c_reeves@yahoo.com

Thomas E. Clay
Clay, Kenealy, Wagner & Adams
tclay@tclaylaw.com

Charles L. House
P.O. Box 26565
1100 Main
Kansas City, MO 64196

Magistrate Judge Tim A. Baker