UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | )<br>)<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) CASE NO. 1:05-cv-1102-DFH-TAB<br>) |
| ALANAR, INC., et al., | )<br>) |
| Defendants, | )<br>) |
| and | )<br>) |
| CHURCHMEN'S INVESTMENT CORPORATION, et al., | )<br>)<br>) |
| Relief Defendants. | ) |

ENTRY ON PLAINTIFF'S MOTION FOR AN ORDER OF DISGORGEMENT,
PREJUDGMENT INTEREST, AND CIVIL PENALTIES AGAINST THE REEVES
DEFENDANTS

The Securities and Exchange Commission filed this civil enforcement action against several entities and individual defendants, including Vaughn A. Reeves, Sr., Vaughn A. ("Chip") Reeves, Jr., Jonathan Christopher ("Chris") Reeves, and Joshua Craig ("Josh") Reeves (collectively "the Reeves"). The Reeves underwrote large numbers of bond offerings that raised at least $120 million, most of them ostensibly to finance church construction and expansion. The Reeves then shuffled money between accounts to hide the defaults that would have occurred otherwise, enticing investors to supply them with more and more funds. The


Reeves violated federal securities laws by misapplying and misappropriating repayments from the churches issuing the bonds and by making false and misleading statements to the purchasers of the bonds. See *SEC v. Alanar, Inc.*, 2007 WL 2479318, at *7-8 (S.D. Ind. Aug. 28, 2007) (Tinder, J.).[1] The SEC has moved for an order of disgorgement, prejudgment interest, and civil penalties against the Reeves. As explained below, the court grants the requested relief and will enter a partial final judgment accordingly.

*Procedural History*

On July 26, 2005, the SEC filed its complaint against the Reeves and various defendant entities. Also on July 26, 2005, the court entered an agreed permanent injunction. By the terms of that order, the Reeves were precluded from disputing the merits of the SEC's claims against them and were ordered to disgorge their ill-gotten gains, plus prejudgment interest. Dkt. 8 at 7-8. The agreed permanent injunction determined the standard of review that would apply to the court's eventual disgorgement and civil penalty determination. *Id.* For purposes of the SEC's disgorgement motion, the parties agreed the court would accept the complaint allegations as true and would determine the issues raised by the motion without regard to the standards for summary judgment contained in Fed. R. Civ. P. 56(c).

---

[1] This matter was reassigned when Judge Tinder was appointed to the Circuit Court.

On July 16, 2007, the court held an evidentiary hearing. The Reeves received notice of the hearing but did not appear and instead chose to invoke their Fifth Amendment privilege against self-incrimination. See SEC Exs. 1-5. Without the Reeves' participation, the court heard evidence concerning the Reeves' conduct. At the conclusion of the hearing, the court issued its findings of fact and conclusions of law. See *Alanar*, 2007 WL 2479318.

The SEC has now moved the court to order the Reeves defendants to disgorge their ill-gotten gains, to order the Reeves defendants to pay prejudgment interest, and to impose civil penalties against them. Because there is no dispute regarding the merits of the SEC's claims and the appropriateness of disgorgement, the only issues before the court are the amount of disgorgement and prejudgment interest and the appropriateness and amount of civil penalties.

*Factual Background*

Alanar was incorporated in 1988 and registered as a broker-dealer with the SEC. Its business focused on underwriting bonds issued by Christian churches throughout the United States. Complaint ¶¶ 11, 25. From 2001 to 2005, Alanar offered and sold units in 42 different affiliated bond funds that invested in the bonds underwritten by Alanar. Dkt. 294, ¶ 5 (Joint Stipulation of Facts and Documents). Alanar sold bonds and units in its affiliated bond funds through its

registered representatives, including Vaughn, Chip, Chris, and Josh Reeves. Complaint ¶ 29.

The Reeves formed numerous affiliated entities during their operation, most notably The Liberty Group ("Liberty"), Guardian Services LLC ("Guardian"), and First Financial Services of Sullivan County ("First Financial"), which acted as paying agents. Complaint ¶¶ 11-14. The paying agents facilitated the flow of funds to and from investors and issuers by maintaining a "proceeds account" and "repayment account" for each bond issue. See *Alanar*, 2007 WL 2479318, at \*4. The proceeds account held the proceeds from the sale of bonds to investors for later disbursement to the bond issuer. The repayment account held the funds received from the issuer for repayment of principal and interest to investors. *Id.* Other affiliated entities in the Reeves' operation included Churchman's Capital Group ("CCG") and Churchmen's Investment Corporation ("CIC"). Complaint ¶¶ 19-24. The Reeves used these entities as conduits for transfers of funds between and among bond issuances, with CIC using an E*Trade account to commingle and transfer investor funds. *Alanar*, 2007 WL 2479318, at \*5. The Reeves controlled each of the entities involved. Complaint ¶¶ 10-24; Carlson Dec. Exs. 1-8.

The investors in Alanar bonds and bond funds received written offering documents, a prospectus, and a private placement memorandum that described their investments and how their funds would be used. See *Alanar*, 2007 WL 2479318, at \*4. The court found these documents to be false and misleading

because the Reeves used the funds in a variety of ways inconsistent with their representations to investors. *Id.* at *7. Some investor proceeds intended for church issuers never made it to the issuer, while other funds repaid by the issuers never made it back to the investors. *Id.* at *7-8. The Reeves diverted approximately $6,003,631 in funds for their own benefit through undisclosed personal loans and amounts withdrawn from the bank and brokerage accounts maintained by entities that they controlled. *Id.* at *5-7; Complaint ¶ 45; Hughes Dec. ¶¶ 12-13, 15, 18, 21; Hughes Dec. Exs. 2-5.

The continued operation of the Reeves' scheme required extensive commingling of investor funds. As the court found in its findings of fact:

> The Reeves would cause money to be removed from one of the Bond Repayment Accounts for one Bond Issue and transferred to CCG, CIC, or Liberty where it was redeployed to Bond Repayment Accounts for other Bond Issues to allow interest payments or principal repayments to be made on that bond. The Reeves would also cause Bond Fund Investor proceeds to be loaned from one Bond Fund to another to supposedly meet cash needs, would cause Bond Fund Investor proceeds to be transferred to the Relief Defendants, and would cause undocumented loans to be made from Bond Fund Investors proceeds to the Relief Defendants and Issuers.

*Alanar*, 2007 WL 2479318, at *5. In this manner, the Reeves concealed (or delayed) defaults and ensured the continued operation of their scheme. The court found that:

> [T]he Reeves' money-making enterprise depended on their ability to underwrite large numbers of bond offerings and, therefore, benefit from the associated underwriting fees. The Reeves underwrote large numbers of bond offerings and then shuffled money between accounts to hide the

> defaults which otherwise would have occurred. This scheme, and the apparent success of earlier Bond Issues, allowed the Reeves to continue to raise more and more money from unsuspecting Investors. Because the Investors believed they were helping churches, they did not demand the high rates of return typically found in a Ponzi scheme, which allowed the scheme to perpetuate itself far longer than a typical Ponzi scheme.

*Alanar*, 2007 WL 2479318, at *8.

Undoubtedly, the Reeves were enriched through the operation of their scheme. Each of them took a substantial undisclosed loan from CCG, with their personal loans from CCG totaling approximately $1.2 million. Dkt 115 (Forensic Accountant's April 3, 2006 Report) Ex. O.1; Howard Dec. Ex. 3. Vaughn Reeves received loans totaling approximately $629,000 from CCG. He also obtained $168,795 in loans from Liberty and $12,000 in loans from Northstar Development. Dkt 115 Ex. O.1; Hughes Dec. Ex. 2. Chip Reeves took an undisclosed loan of $235,000 from CCG and used the funds to "build his house" according to one of his interrogatory responses. Howard Dec. Ex. 3. In the course of its investigation, the SEC discovered that Chip Reeves had a practice of endorsing checks made payable to various entities and depositing the funds into his personal bank accounts. Hughes Dec. ¶ 16. Chris Reeves took an undisclosed loan of $233,000 from CCG. Dkt. 115 Ex. O.1. He withdrew at least $80,000 from a CIC bank account under the guise of a loan to an entity named Trinity Capital Investments. The Commission obtained the bank account records for Trinity Capital Investments and discovered that Chris Reeves controlled the account and used the funds deposited into the account to pay personal expenses. Hughes Dec. ¶ 19. Josh

Reeves took undisclosed loans in the amount of $104,000 from CCG. Dkt. 115 Ex. O.1.

Although the Reeves did pay some money back into the entities, the SEC was unable to determine the actual use of those funds because of the extensive commingling in the accounts of the various Reeves-controlled entities. *Alanar*, 2007 WL 2479318, at *9; SEC Br. at 13. For the most part, the Reeves have refused to participate or cooperate with the SEC or the Receiver since this litigation began. The SEC served the Reeves with discovery requests, and the Reeves produced uninformative responses. See Howard Dec. Exs. 2-5. In response to the SEC's interrogatory regarding their practice of commingling, the Reeves claimed, without any discernable basis, either that they were not involved in the commingling of funds, that commingling was accomplished in the normal course of business and was unintentional, or that they did not recall commingling. See Howard Dec. Exs. 2-5. Rather than appear for depositions or provide testimony to the court, the Reeves invoked their privilege against self-incrimination.

Vaughn Reeves has provided some assistance to the SEC and the Receiver. He appeared before members of the SEC's staff to answer questions about the accounting and transactions involved in the Reeves' operation. See Hughes Dec. ¶ 3. He has turned over real estate assets to the Receiver, including all of the assets owned by the Reeves Family Limited Partnership. Dkt. 162, 309. He has assured the SEC that he will voluntarily relinquish his title to a development in

Huntsville, Alabama, and will allow the Receiver to dispose of the property. (It is unclear whether this has occurred.) None of the other Reeves — Chip, Chris, or Josh — has provided even this modest level of cooperation. SEC. Br. at 15.

*Disgorgement and Prejudgment Interest*

By the terms of the court's permanent injunction order, the Reeves may not dispute the merits of the SEC's case against them and must disgorge their ill-gotten gains, plus prejudgment interest, in amounts to be determined by the court. The SEC now moves for disgorgement and has calculated that the Reeves received approximately the following amounts in ill-gotten gains: Vaughn Reeves — $2,862,191; Chip Reeves — $1,806,105; Chris Reeves — $905,930; Josh Reeves — $429,405 in ill-gotten gains. The SEC proposes that the court order the Reeves defendants to pay these amounts in disgorgement. As discussed below, the court finds that these figures should be adequate to deprive the Reeves defendants of their ill-gotten gains and are not punitive.

Disgorgement of illegal profits and unjust enrichment is an equitable remedy available under the federal securities laws. *SEC v. First City Financial Corp.,* 890 F.2d 1215, 1230 (D.C. Cir. 1989). The remedy is "designed to deprive a wrongdoer of his unjust enrichment and to deter others from violating the securities laws." *Id.* The disgorgement figure calculation is discretionary and need not be exact. *SEC v. First Jersey Secs. Inc.*, 101 F.3d 1450, 1474-75 (2d Cir. 1996). The SEC is required to show that the amount of disgorgement is a "reasonable approximation"

of the profits the defendant reaped from the wrongful conduct. See *First City Financial Corp.*, 890 F.2d at 1231; *SEC v. Randy*, 38 F. Supp. 2d 657, 673-74 (N.D. Ill. 1999). The burden then shifts to the defendant to show that this approximation is inaccurate. *First City Financial Corp.*, 890 F.2d at 1232; *Randy*, 38 F. Supp. 2d at 674. Any ambiguity in the calculation should be resolved against the defrauding party. *SEC v. Lorin*, 76 F.3d 458, 462 (2d Cir. 1996); *SEC v. Patel,* 61 F.3d 137, 140 (2d Cir. 1995); *SEC v. Great Lakes Equities Co.*, 775 F. Supp. 211, 214 n.21 (E.D. Mich. 1991). However, disgorgement is not a punitive remedy. *Rowe v. Maremont*, 850 F.2d 1226, 1241 (7th Cir. 1988).

Courts do not require the SEC to trace every dollar of a defendant's ill-gotten gains. *SEC v. First Pacific Bancorp.*, 142 F.3d 1186, 1192 n.6. (9th Cir. 1998). Where the defendants have commingled the money, the SEC is not required to identify the misappropriated money. *Great Lakes Equities* Co., 775 F. Supp. at 214 n.21. "Since calculating disgorgement may at times be a near-impossible task, the risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." *Id.*, citing *First City Fin. Corp.*, 890 F.2d at 1232. In light of the evidence of commingling in this case, that principle applies directly to this case.

The SEC calculated its proposed disgorgement amounts in the following manner. Kathleen Hughes, an SEC accountant, reviewed account opening documents, monthly statements, cancelled checks, check stubs, cashier's checks, wire transfers, deposit slips, and deposit items, among other documents. Hughes

Dec. ¶ 4. She also reviewed records from bank accounts maintained by the various entities associated with the Reeves to determine whether there were other transactions conducted for the benefit of the Reeves that did not otherwise appear. Hughes Dec. ¶ 5. She reviewed the accountings prepared by the Reeves and by the relief defendants, and she reviewed the forensic accountant's report that was filed with the court on April 5, 2006. Hughes Dec. ¶¶ 6-7; Dkt. 115. Exhibits O and O.1 of that report identified payments made to some of the Reeves defendants by the relief defendants and loans made to the Reeves. Hughes Dec. ¶¶ 6-7; Dkt. 115.

Including transactions from January 2001 to January 2005, Hughes calculated all payments made to the Reeves defendants or made for the benefit of the Reeves defendants by entities named as defendants or relief defendants in this action and entities that maintained accounts to which the Reeves defendants made payments or from which they received payments. Hughes Dec. ¶ 8. She excluded from her calculation any payments to the Reeves that were described in the records or otherwise explained as being related to legitimate business expenses. Hughes Dec. ¶ 9. Hughes also identified potentially offsetting transactions in which the Reeves defendants appeared to have repaid money to their affiliated entities. Hughes Dec. ¶ 10. However, the SEC was unable to determine the use of these repaid funds because of the extensive commingling in the accounts. SEC Br. at 13.

Overall, Hughes' examination of the documents revealed that the Reeves defendants received ill-gotten gains totaling a gross amount of $6,003,631. Hughes Dec. ¶ 12. By Hughes' investigation and calculations, Vaughn Reeves received approximately $2,862,191 in ill-gotten gains, with a potential offset of $602,190. Hughes Dec. ¶¶ 13-14; Hughes Dec. Ex. 2. Chip Reeves received approximately $1,806,105 in ill-gotten gains, with a potential offset of $618,529.[2] Hughes Dec. ¶¶ 15-17; Hughes Dec. Ex. 3. Chris Reeves received approximately $905,930 in ill-gotten gains, with a potential offset of $32,277.[3] Hughes Dec. ¶¶ 18-20; Hughes Dec. Ex. 4. Josh Reeves received approximately $429,405 in ill-gotten gains, with a potential offset of $16,394. Hughes Dec. ¶ 21; Hughes Dec. Ex. 5.

---

[2] In making this calculation, Hughes included payments to Chip Reeves or for his benefit from several entities that were not named as defendants or relief defendants in this litigation. Hughes noted that Chip Reeves regularly endorsed checks made out to other parties (including "Triad Capital Advisors," "Triad Asset Management," and "Churchmen's Capital Group A")and deposited those checks into his personal bank accounts. The SEC could not determine whether these entities existed and, if so, what Chip Reeves' association with them was. See Hughes Dec. ¶ 16.

[3] Hughes' calculation of Chris Reeves' ill-gotten gains included payments to him or for his benefit from several entities that were not named as defendants or relief defendants in this litigation, including Trinity Capital Investments, LLC and Toddler Town. Hughes noted that CIC made a payment of $80,000 to "Trinity Capital Investments," and that "Jonathan Reeves" was listed as the registered agent of Trinity Capital Investments. She discovered a bank account maintained in the name of Trinity Capital Investments and controlled by Chris Reeves. She reviewed the bank record of that account and found that Chris Reeves used funds from that account to pay personal expenses. Hughes also included in her calculation two checks written on Toddler Town's bank account, each for $25,000 and made payable to Chris Reeves, with a memo line reading only "expense reimbursement." Chris Reeves was a signatory on the Toddler Town account, and Alanar identified the Toddler Town account as associated with Alanar. Hughes Dec. ¶ 19.

The SEC recommends that the court order disgorgement in the amount of the gross amount of money received by the Reeves defendants because the pervasive commingling in the accounts Hughes reviewed prevented the SEC from determining the use of funds that the Reeves paid back to their entities during the operation of their scheme. Judge Tinder found that the Reeves, to conceal the high rate of default that would have otherwise occurred and thwarted their operation, repeatedly diverted investor and issuer proceeds. *Alanar*, 2007 WL 2479318, at *6. These diversions encompassed more than 7,000 transactions and resulted in more than $23,612,000 in related party receivables and $19,105,000 in related party payables. *Id.* The Reeves defendants do not dispute the SEC's analysis or calculations. They have not presented any evidence or testimony to contradict the SEC's calculations and have provided no documentation or explanation of the amounts they repaid to their affiliated entities.

The court finds that the SEC has shown that the disgorgement amounts it recommends are a "reasonable approximation" of the profits the Reeves reaped from their wrongful conduct. See *First City Financial Corp.*, 890 F.2d at 1231; *Randy*, 38 F. Supp. 2d at 674. The Reeves have not made any attempt to demonstrate that the SEC's approximation is inaccurate or otherwise inappropriate. Without a credible explanation regarding the repayments the Reeves made to their entities, the court must resolve the uncertainty against the Reeves. *Lorin*, 76 F.3d at 462; *Patel,* 61 F.3d at 140; *First City Financial Corp.*,

890 F.2d at 1232; *Great Lakes Equities Co.*, 775 F. Supp. at 214 n.21. Accordingly, the court adopts the recommendation of the SEC and orders disgorgement against the Reeves in the following amounts: $2,862,191 against Vaughn Reeves; $1,806,105 against Chip Reeves; $905,930 against Chris Reeves; and $429,405 against Josh Reeves. These figures represent reasonable and non-punitive amounts sufficient to deprive the Reeves of their ill-gotten gains.

In addition, the court orders the Reeves to pay prejudgment interest. An award of prejudgment interest ensures that the Reeves do not "benefit from what amounts to an interest-free loan obtained as a result of illegal activity." *SEC v. House Asset Mgt., Inc.*, 2004 WL 2125773, at *2 (C.D. Ill. 2004). Pursuant to the permanent injunction, prejudgment interest shall be calculated based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2). Dkt. 8 at 7. Accordingly, the court orders the Reeves to pay prejudgment interest on the disgorgement amounts calculated from the last month in which each defendant received ill-gotten gains through the date of this order.[4]

*Civil Penalties*

---

[4] Prejudgment interest shall be calculated starting on August 1, 2005 for Vaughn Reeves; May 1, 2005 for Chip Reeves; September 1, 2005 for Chris Reeves; and September 1, 2005 for Josh Reeves. See Hughes Dec. Exs. 6-9.

The SEC also seeks for civil penalties against the Reeves. There are three tiers of civil monetary penalties in federal securities law. The first tier applies to negligent violations and carries a maximum penalty of $5,000 or the gross amount of pecuniary gain to the defendant. See 15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B). The second tier applies to violations involving "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," and carries a maximum penalty of $50,000 per violation or the defendant's gross amount of pecuniary gain. *Id.* The third and highest tier applies where the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and the violation also "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. § 15t(d)(2)(C), § 78u(d)(3)(B)(iii). Third tier penalties carry a penalty of up to $100,000, but, after adjustments for inflation, the maximum civil penalty against human beings for third tier violations is $120,000 for violations occurring after February 2, 2001. See 17 C.F.R. § 201.1002, § 201 Subpt. E, Tbl. II. The SEC requests that the court impose third tier penalties against each of the Reeves.

In determining what the penalties should be, the court should consider the seriousness of the violations, the defendant's intent, whether the violations were isolated or recurring, whether the defendant has admitted wrongdoing, the losses or risks of losses caused by the conduct, and any cooperation the defendant provided to enforcement authorities. See *SEC v. Church Extension of Church of Church, Inc.*, 429 F. Supp. 2d 1045, 1050-51 (S.D. Ind. 2005); *SEC v. Cavanagh*,

2004 WL 1594818, at *31 (S.D.N.Y. July 16, 2004); *SEC v. Custable*, 1996 WL 745372, at *2-5 (N. D. Ill. Dec. 26, 1996), *aff'd*, 132 F.3d 36 (7th Cir. 1997).

Here, the Reeves engaged in a scheme of fraud and deceit over the course of several years. Through more than 7,000 improper transactions involving extensive commingling, they concealed the true rate of default on Alanar bonds, enticing more and more investors to trust them with more and more money. Meanwhile, the Reeves helped themselves to the pot, taking undisclosed loans and withdrawals from the entities they controlled. Today, $140 million of $175 million in total bond indebtedness is in default. Thousands of investors have been harmed by the Reeves' conduct, and the true extent of the harm may not ever be fully ascertained. Since their activities came to light and the Reeves were enjoined from perpetuating their fraud any further, only Vaughn Reeves has cooperated with the SEC and the Receiver in a modest way. Chip, Chris and Josh Reeves have not done so at all.

Third tier penalties are warranted in this case. The Reeves' violations were egregious and involved a high degree of fraud and deceit. Over the course of years and repeated improper transactions, the Reeves caused extensive harm to thousands of trusting investors. None of the Reeves has admitted wrongdoing, and Chip, Chris, and Josh Reeves have not cooperated or assisted the SEC or the Receiver at all. Although Vaughn Reeves has cooperated with the SEC and the Receiver, his cooperation has not sufficiently overcome his central role in the

scheme and the nature and extent of the underlying violations he committed such that he would be deserving of a lesser civil penalty.

*Conclusion*

For the foregoing reasons, the court orders disgorgement against the Reeves in the following amounts: $2,862,191 against Vaughn Reeves, $1,806,105 against Chip Reeves, $905,930 against Chris Reeves, and $429,405 against Josh Reeves. The court orders the Reeves to pay prejudgment interest based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax and calculated from the last month in which each Reeves defendant received ill-gotten gains through the date that a partial final judgment is entered. Finally, the court orders a third-tier civil monetary penalty to be assessed against each Reeves defendant in the amount of $120,000. Pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the court finds there is no just reason for delay and that a partial final judgment should be entered as to these obligations and penalties. The court requests that the SEC calculate prejudgment interest and tender a suitable form of partial final judgment as soon as practicable.

So ordered.

Date:  May 6, 2008

_David F. Hamilton_
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Joshua D. Hague
KRIEG DEVAULT LLP
jdh@kdlegal.com

Jason Adam Howard
U.S.SECURITIES AND EXCHANGE COMMISSION
howardja@sec.gov,jahoward@sbcglobal.net

H. James Maxwell
hjmesq@kc.rr.com,hjmesq@sbcglobal.net

Mark J. R. Merkle
KRIEG DEVAULT LLP
mmerkle@kdlegal.com

Nicholas Anthony Miller
INDIANA STATE ATTORNEY GENERAL
nmiller@atg.state.in.us,nicholas_miller@1stcounsel.com

David I. Rubin
HARRISON & MOBERLY
drubin@h-mlaw.com,acooper@h-mlaw.com

Michael Joseph Rusnak
HARRISON & MOBERLY
mrusnak@h-mlaw.com,vbasile@h-mlaw.com

John Joseph Sikora , Jr
US SECURITIES & EXCHANGE COMMISSION
sikoraj@sec.gov,jsikora621@yahoo.com

Bradley W. Skolnik
STEWART & IRWIN
bskolnik@stewart-irwin.com

Gordon J. Toering
WARNER NORCROSS & JUDD LLP
gtoering@wnj.com

Charles L. House
P O Box 26565
1100 Main
Kansas City, MO 64196

-18-

Jonathan Christopher Reeves
207 E. Washington Street
Sullivan, IN 47882-1544

Joshua Craig Reeves
5243 Terrace Ridge DR
Milford, OH 45150-5019

Vaughn A. Reeves, Jr.
900 Hillside Drive
Sullivan, IN 47882

Vaughn A. Reeves, Sr.
5243 Terrace Ridge Drive
Milford, OH 45150-5819